UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL J. FLORES, | ) |
| Plaintiff, | ) Case No. 10 C 6512 |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| MICHAEL ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Daniel J. Flores, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), has filed a motion seeking summary reversal and/or remand of a final decision by the Commissioner of Social Security denying his applications for social security benefits (doc. #34).[2] The Commissioner has filed a response asking the Court to affirm the ALJ's opinion (doc. # 40). For the following reasons, we grant Mr. Flores's motion to remand.

### I.

Mr. Flores was born on March 16, 1957 (R. 120). He worked for more than seventeen years as a mixer at a cookie factory (R. 101-03), an unskilled job that required standing, walking, and heavy lifting (R. 12-13, 126). Mr. Flores worked at this job until September 2007, when the plant

---

[1] On May 17, 2011, by consent of the parties (doc. # 22) and in accordance with 28 U.S.C. § 636(c), this matter was referred to this Court for all further proceedings, including the entry of final judgment (doc. # 23).

[2] On August 9, 2011, the Court granted Mr. Flores's motion to file a corrected motion for summary judgment and accompanying documents (doc. # 33), thus mooting Mr. Flores's earlier-filed motion on July 29, 2011 (doc. # 28). In addition to his corrected motion and memorandum in support of summary judgment, Mr. Flores filed a corrected Local Rule 56.1(a) statement of uncontested facts (doc. # 36). The Commissioner did not respond to the statement of uncontested facts. While parties are generally required to follow Local Rule 56.1 on motions for summary judgment, courts in this district do not require parties to follow those procedures on review of the denial of Social Security benefits. Accordingly, we consider plaintiff's statement of undisputed facts as part of his memorandum in support of summary judgment.

was shut down, and he has been unemployed since then (R. 125). He was 51 years old when he filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 9, 2008 (R. 92, 95). Mr. Flores alleges a disability onset date of February 9, 2008 (*Id.*).

**A.**

On February 9, 2008, Mr. Flores fell on ice and fractured his left patella (knee cap) (R. 225). At the time of this injury, Mr. Flores was unemployed, but was about to enter into a training program to acquire new job skills (R. 12).

Two days after his fall, Mr. Flores met with Dr. David Mehl, an orthopedic surgeon, for treatment of his knee injury. Dr. Mehl's treatment notes from that visit indicate that Mr. Flores had a fracture of his left patella, as well as a significant amount of bruising and swelling throughout his knee (R. 302). He also found that Mr. Flores had "some degenerative component to the patella from previous degenerative disease" (*Id.*). Dr. Mehl opined that Mr. Flores needed to be "strictly non-weightbearing with crutches" (*Id.*). At Mr. Flores's follow-up visit on February 18, 2008, Dr. Mehl noted that the fracture was stable, and that Mr. Flores would "need physical therapy once he heals the fracture" (R. 303). At the next visit, on February 25, 2008, Dr. Mehl again opined that the fracture was stable (R. 304).

Mr. Flores saw Dr. Mehl regularly from February 2008 through July 2008 for treatment of his knee injury. On March 17, 2008, Dr. Mehl's treatment notes indicate that x-rays showed good alignment of the fracture with minimal displacement (R. 305). Dr. Mehl found that Mr. Flores's left knee fracture was healing and that he could begin partial weight bearing with crutches (*Id.*). Dr. Mehl prescribed physical therapy for mobilization and strengthening, but opined that Mr. Flores would "remain off work until he gets adequate healing of this fracture" (*Id.*). On April 14, 2008, Dr.

Mehl noted that the fracture was healing, and that Mr. Flores had been engaged in physical therapy and was improving (R. 306). He found that Mr. Flores "can be full weightbearing now," but needed to continue therapy to maximize recovery (*Id.*).

On May 14, 2008, Dr. Mehl's treatment notes indicate that there was "further progress toward healing" of Mr. Flores's knee and that Mr. Flores was "improving with respect to pain," though he still had "some difficulties" (R. 307). He opined that Mr. Flores needed to continue physical therapy, and was still "unable to do any heavy type work at this time" (*Id.*). On June 16, 2008, Dr. Mehl noted that Mr. Flores's left kneecap fracture was "[n]early-healed," but that Mr. Flores had "[p]ersistent left quadriceps weakness" (R. 308). He stated that Mr. Flores "will be switched from regular therapy to work hardening, as he has to be able to lift 100-pound bags in his type of occupation" (*Id.*).

On June 27, 2008, Mr. Flores presented to a hospital emergency room complaining that he had "tweaked" his back, and that the pain had been getting worse (R. 283). The hospital's physical examination and x-rays showed tenderness with movement at the low back, and evidence of lumbar sprain and spurring at certain vertebrae (R. 283-84). Mr. Flores was diagnosed with osteoarthritis of the lumbar spine (R. 284).

At Mr. Flores's first visit with Dr. Mehl after his back injury, on July 16, 2008, Dr. Mehl reported that Mr. Flores's left patella fracture was "[n]early healed," but that he had "[p]ersistent left knee pain/weakness" (R. 309). Dr. Mehl noted that Mr. Flores's back was "preventing him from returning to work conditioning" (*Id.*). Dr. Mehl gave Mr. Flores a prescription to resume work hardening "when he is able to resume that due to his back problem" (*Id.*). He concluded that Mr. Flores "is still unable to work and this could be for a few more months yet" (*Id.*). Mr. Flores

3

received bilateral facet block and medial branch block (MBB) injections for his back pain, as well as other pain treatment, throughout 2008 and at least into September 2009 (R. 314-32).

B.

The record contains two Disability Determination Services ("DDS") opinions. On May 6, 2008, before Mr. Flores injured his back, Dr. Reynaldo Gotanco reviewed the medical documents and opined that Mr. Flores's knee injury would not last twelve months from the onset date (R. 269). On July 29, 2008, Dr. Virgilio Pilapil reviewed Dr. Gotanco's decision, and found that it was "substantively and technically correct" (R. 312). Dr. Pilapil further noted that since Dr. Gotanco's opinion, Mr. Flores had "twisted his back and had a period of pain" (*Id.*). Nonetheless, he concluded that Mr. Flores's "condition continues to improve," that Mr. Flores was partially credible, and that the "amount of alleged impairment remains disproportionate to that expected from the objective findings and progress of recovery" (*Id.*).

C.

After Mr. Flores's SSI and DIB applications were denied initially and upon reconsideration (R. 51, 56), a hearing was held before Administrative Law Judge ("ALJ") Sherry Thompson on August 26, 2009 (R. 1). Mr. Flores appeared without counsel (R. 4). The ALJ explained Mr. Flores's right to counsel and the benefits of counsel, but Mr. Flores proceeded without representation (R. 4-5). Mr. Flores and vocational expert ("VE") James Breen testified at the hearing (R. 1).

Mr. Flores testified that he is "still constantly going to Stroger's Hospital . . . for pain management in the pain clinic there" (R. 5-6). His knee is still very sore and he gets discomfort in his knee and back after long rides in the car (R. 14). Mr. Flores can walk or stand for at least one hour in an eight-hour day, but after an hour his leg tightens up, and he has to sit for 20 to 30 minutes

with his leg up (R. 15-16). He uses a cane when he is doing a lot of walking (R. 15). He can sit for two to three hours, but then he has to move around (R. 16).

Mr. Flores stopped going to therapy for his knee after he "tweak[ed]" his back because he could no longer lift (R. 14). The most he can lift is a 12-pack of soda (R. 19). He has back pain every morning when he wakes up; some days the pain is sharp, while other days it is an ache (R. 16). His back pain used to tingle down his legs, but the pain now stays in his lower back since he has been getting cortisone shots every three months, which provide relief for only one to two weeks (R. 17-18). He can bend a little, but he cannot bend down to pick things up or squat (R. 18-19). At night, he wakes up every couple of hours from the pain (R. 19).

Mr. Flores takes care of his own personal hygiene, such as showering, dressing, and shaving, but it causes him minor back pain (R. 19-20). During a typical day, he sits around, reads the newspaper, does crossword puzzles, or watches television (R. 20). He used to play chess for 4 to 5 hours once a week (*Id.*). Mr. Flores feels pain throughout the day, so his daughter or granddaughter does most of the housework (R. 16). He tries to clean up, but sometimes he has to sit down and take a pain killer, such as Tylenol Three, Ibuprofen 800, and Tramadol (R. 16-17). He does not cook or wash dishes much because standing in one place gives him sharp pains in his back (R. 20-21). He does not do yard work (R. 20).

The ALJ asked the VE to testify regarding the jobs available for various hypothetical individuals with different Residual Functional Capacities ("RFCs"). The ALJ asked whether a significant number of jobs would be available for a person limited to light work (which requires lifting 10 pounds frequently and 20 pounds occasionally), with postural limitations that allowed only occasional climbing of stairs, balancing, stooping, kneeling, crouching, and crawling, and no

5

climbing of ladders, ropes or scaffolding (R. 23-24). The VE identified fast food worker, mail clerk, and cashier jobs that such a person could perform and that exist in significant numbers (R. 24).

The ALJ then asked whether a significant number of jobs would be available to a person who had those same postural limitations but was limited to sedentary work, with a need to alternate sitting and standing after three hours and a need to sit after standing for 20 minutes (R. 24). The VE testified that if Mr. Flores was limited to sedentary work, Vocational Grid Rule 201.12 would apply due to Mr. Flores's age (*Id.*). Under that rule, Mr. Flores would qualify for benefits.

In response to additional hypotheticals, the VE testified that if a person with the foregoing limitations needed a sit/stand option every two hours, the person would remain limited to sedentary jobs, but if the person needed to sit for only 20 minutes out of two hours, the person could perform light work (R. 28). The ALJ did not ask the VE whether a person who needed to sit for a period of 20 minutes after one hour of standing could perform light work.

In the month after the hearing, the ALJ received and entered into the record additional medical evidence from the Cook County Pain Clinic of Stroger Hospital regarding a September 2, 2009 office visit (R. 328-33), and medical reports from a Dr. Bruce Parisi dated from 1999 to 2006, which preceded Mr. Flores's alleged date of disability (R. 335-63).

### D.

On November 5, 2009, the ALJ issued a written decision denying benefits and finding that Mr. Flores was not disabled under the Social Security Act ("the Act") (R. 35-44). Initially, the ALJ noted that Mr. Flores meets the Act's insured status requirements through December 31, 2012 (R. 39-40). The ALJ then applied the required five-step analysis set forth in the Social Security

regulations. *See* 20 C.F.R. § 404.1520(a)(4). At Step 1, the ALJ found that Mr. Flores has not engaged in substantial gainful activity since February 9, 2008, the alleged onset date (R. 40).

At Step 2, the ALJ found that Mr. Flores has the severe impairments of osteoarthritis of the lumbar spine, as well as diabetes and hypertension (R. 40). Mr. Flores had been treated with medication for diabetes and hypertension since the years preceding his alleged date of disability (R. 337-42). The ALJ found that Mr. Flores's broken knee cap did not constitute a severe impairment because x-rays from March 2008 showed good alignment of the fracture with minimal displacement, and the record showed that the knee was healing and would heal within a twelve-month period (R. 41). At Step 3, the ALJ found that Mr. Flores's severe impairments do not meet or medically equal any impairment listed in 20 C.F.R. § 404.1520, Appendix 1 (*Id.*).

The ALJ determined that Mr. Flores has the RFC to perform light work with "postural limitations involving the avoidance of climbing ladders, ropes and scaffolds," but that he has "the occasional ability to perform tasks involving climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling" (R. 41). The ALJ did not include in the RFC any limitation on standing or sitting, or any option for Mr. Flores to alternate between sitting and standing at certain intervals.

The ALJ found that Mr. Flores's diabetes and hypertension were managed with medication (R. 42), and thus did not create any limitations that affected Mr. Flores's RFC. The ALJ noted that Mr. Flores "tweaked" his back on June 27, 2008, and that he received pain treatment, including injections, in December 2008 and May 2009 (*Id.*). Nevertheless, Mr. Flores reads, watches television, plays chess, and can lift a twelve-pack of soda (*Id.*). Ultimately, the ALJ accepted the determination of the DDS medical consultants that Mr. Flores had no impairments that would

prevent performance of substantial gainful work activity (R. 43). While referring to medical "consultants" in the plural, the ALJ only cited to Dr. Gotanco's May 6, 2008 evaluation (*Id.*).

At Step 4, the ALJ found that Mr. Flores is unable to perform any of his past relevant work (R. 43). At Step 5, the ALJ determined that Mr. Flores's age, education, work experience, and RFC allow him to perform jobs that exist in significant numbers in the national economy, such as fast food worker, mail clerk, and cashier (R. 43-44).

On December 29, 2009, Mr. Flores filed a request for review of the ALJ's decision (R. 91). The Appeals Council denied the request (R. 48), making the ALJ's decision the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 883, 841 (7th Cir. 2007).

## II.

We begin our analysis of the Commissioner's decision by laying out the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled under the law, the ALJ must sequentially evaluate whether: (1) the claimant is currently performing any "substantial gainful activity;" (2) the claimant's alleged impairment or combination of impairments is severe; (3) any of the claimant's impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) the claimant is unable to perform his past relevant work based on his RFC; and (5) the claimant's RFC renders him unable to perform any other work in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant has

the burden of proof in Steps 1 through 4, and the burden shifts to the Commissioner in Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

We will uphold an ALJ's decision if it is supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotations omitted). To meet this standard, an ALJ must build a "logical bridge" between the evidence in the record and her conclusions. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The ALJ must consider all relevant evidence, and may not selectively discuss only the evidence that favors her ultimate conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). We will not uphold an ALJ's decision that mischaracterizes the medical evidence or fails to mention significant evidence that supports the plaintiff's claim. *Golembiewski v. Barnhart*, 322 F.3d 912, 916-17 (7th Cir. 2003); *see also Parker*, 597 F.3d at 921.

### III.

Mr. Flores contends that the ALJ erred by: (1) finding his knee injury to be non-severe; (2) failing to consider the cumulative effects of Mr. Flores's back and knee injuries in determining the RFC, because his back injury prevented Mr. Flores from being able to fully recover from his knee injury; (3) discrediting Mr. Flores's allegations of pain and misstating the evidence regarding Mr. Flores's pain treatment; and (4) failing to include all of Mr. Flores's functional limitations in his hypotheticals to the VE. For the reasons we explain below, we agree that several significant deficiencies in the ALJ's opinion require a remand.

## A.

The ALJ ignored record evidence to the contrary when she determined that Mr. Flores's knee injury was not severe because it was healing and would be healed within 12 months. The ALJ reviewed Dr. Mehl's treatment notes from March 2008, and concluded based on these reports that Mr. Flores's knee injury was healing (R. 41). The ALJ, however, ignored Dr. Mehl's later reports indicating that Mr. Flores's knee rehabilitation had been impaired by his June 2008 back injury. In his July 16, 2008 report, Dr. Mehl acknowledged that Mr. Flores's left patella fracture was "[n]early healed," but he noted "[p]ersistent left knee pain/weakness" (R. 309), and he reported that Mr. Flores's back was "preventing him from returning to work conditioning" (*Id.*). Dr. Mehl concluded that Mr. Flores "is still unable to work and this could be for a few more months yet" (*Id.*).

The ALJ was required to discuss this evidence that Mr. Flores's back injury impeded his recovery from his knee injury. An ALJ may not selectively rely on a treating physician's notes indicating a claimant had improved with treatment, while disregarding notes indicating the claimant was still markedly limited in his ability to work. *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011). Moreover, "[e]ven if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling." *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

This omission is significant, as the cumulative effect of a back injury and the knee injury may have led to greater limitations in the RFC than the ALJ found. At a minimum, for the ALJ to discount the effect of Mr. Flores's back condition on his ability to fully rehabilitate his knee, the ALJ would have had to address that evidence and explain why she found that it created no additional

limitations. However, the ALJ failed even to mention the evidence, much less analyze it. This shortcoming in the ALJ's opinion requires a remand.[3]

**B.**

The ALJ's decision to adopt the opinions of Drs. Gotanco and Pilapil, the DDS medical consultants, that Mr. Flores has no impairments that would prevent the performance of substantial gainful work activity was not sufficiently explained to enable us to determine if it is supported by substantial evidence in the record (*see* R. 43). Absent good reason, the assessment of a treating physician is entitled to controlling weight. *Scott*, 647 F.3d at 739 ("An ALJ must offer 'good reasons' for discounting the opinion of a treating physician"). In determining the weight to give the opinion of a treating physician, the ALJ must consider "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

The ALJ here did not perform this analysis. If the ALJ had done so, she might have been compelled to give more weight to Dr. Mehl's opinion. While neither DDS physician examined Mr. Flores, Dr. Mehl – an orthopedic surgeon – treated Mr. Flores consistently for at least six months. Furthermore, the ALJ cited only to Dr. Gotanco's opinion, which was issued prior to Mr. Flores's back injury and Dr. Mehl's opinion about how that affected Mr. Flores's recovery from his knee injury (R. 43). And, even if the ALJ did consider Dr. Pilapil's later opinion despite not mentioning

---

[3] In so holding, we do not address whether, in light of this evidence, Mr. Flores's knee condition constitutes a severe impairment at Step 2. Rather, we leave it for the ALJ to consider that issue anew on remand.

11

it in the opinion, Dr. Pilapil's finding that Mr. Flores experienced only "a period of pain" after twisting his back is not supported by the record, as we discuss further below.

## C.

The ALJ's decision to discount Mr. Flores's testimony as to his pain and functional limitations is problematic. The ALJ found that Mr. Flores's "alleged degree of pain and functional limitations" is "inconsistent with the objective findings which do not show such disabling residual factors such that he is unable to perform substantial gainful work activity" (R. 42). Central to this finding was the ALJ's statement that the medical evidence in the record showed that Mr. Flores's back pain is "relieved by Cortisone injections that he receives once or twice a week" (*Id.*). Under the ALJ's formulation of Mr. Flores's testimony, the injections would have provided a nearly constant source of pain relief. However, the ALJ's explanation misstated the record. Mr. Flores only received the cortisone injections about once "every three months," and they relieved his pain for only one to two weeks after each round of injections (R. 17-18). This patent error undermines the central stated basis for the ALJ's credibility determination.[4]

Moreover, contrary to the ALJ's finding, the medical records show that Mr. Flores has received extensive pain treatment for his back and knee, as well as nerve-blocking injections in his lower back to reduce his pain, the most recent treatment in the record occurring on September 2, 2009 (R. 326; *see also* R. 314 (September 3, 2008); R. 315 (October 15, 2008); R. 318 (February 4,

---

[4]The fact that the injections were received less frequently than the ALJ stated does not, contrary to the Commissioner's assertion, support the ALJ's credibility finding (*See* Def.'s Resp. at 8 n.4). *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (An ALJ "must not draw any inferences" about a claimant's condition from the infrequency of his treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care"). There is no evidence that more frequent cortisone injections would be advisable. Moreover, as we discuss below, there is evidence of Mr. Flores's consistent use of other pain treatments (R. 314-32).

2009); R. 320 (April 3, 2009); R. 323 (May 29, 2009)).[5] The ALJ failed to mention Mr. Flores's most recent pain treatment, on September 2, 2009, though it was added to the record, and Mr. Flores testified that his pain treatments were ongoing. It is unlikely that Mr. Flores "would have undergone the pain-treatment procedures that []he did . . . merely in order to strengthen the credibility of h[is] complaints of pain and so increase h[is] chances of obtaining disability benefits." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). Moreover, there is evidence of Mr. Flores's consistent use of over-the-counter pain medication to deal with his condition (R. 16-17).

Finally, we note that the ALJ found that while Mr. Flores's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessed herein" (R. 42). The Seventh Circuit recently criticized this formulation. *See Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012) (remanding case, in part, because of ALJ's improper credibility finding, which found claimant's statements not credible to the extent they were inconsistent with the ALJ's chosen RFC). That criticism is not new. Over the past two years, the Seventh Circuit has repeatedly criticized this approach to making credibility determinations, which it has dismissed as "meaningless boilerplate." *See, e.g., Parker*, 597 F.3d at 922; *Martinez*, 630 F.3d at 696-97; *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010). On remand, we urge the ALJ to take heed of this Seventh Circuit case law when making any credibility assessments.

---

[5]Mr. Flores also had a follow up treatment on October 15, 2009 (R. 322).

## CONCLUSION

For the reasons set forth above, we grant Mr. Flores's motion for reversal and/or remand (doc. # 34), and we deny the Commissioner's motion to affirm (doc. # 40). This case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: April 26, 2012

---

[6] Given our decision to remand on the foregoing grounds, we need not address Mr. Flores's contention that the ALJ's hypothetical questions to the VE were based on a residual functional capacity not possessed by Mr. Flores. In particular, the ALJ did not ask whether a person who – as Mr. Flores testified – could stand for only an hour before needing to sit for 20 minutes could perform light work. The ALJ did not include that limitation in the RFC she assigned to Mr. Flores; nor did she explain why she omitted this limitation. The ALJ should revisit this issue on remand. If the ALJ determines that greater limitations should be part of Mr. Flores's RFC, the ALJ must account for those limitations in her questions to the VE. *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (noting that the Seventh Circuit has "stated repeatedly that ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity," including all of the physical and mental limitations the ALJ deems credible).